```
         IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF TENNESSEE
                   WESTERN DIVISION
_____

UNITED STATES OF AMERICA,        )
                                 )
     Plaintiff,                  )
                                 )
v.                               )   No. 22-cr-20133-JTF-tmp
                                 )
MARLON DONELSON,                 )
                                 )
     Defendant.                  )
_____

               REPORT AND RECOMMENDATION
_____
```

Before the court by order of reference is defendant Marlon Donelson's Motion to Suppress. (ECF No. 21.) For the reasons below, the undersigned recommends that the motion be denied.

### I. PROPOSED FINDINGS OF FACT

The following proposed findings of fact are based on the evidence presented at the suppression hearing, as well as the parties' briefs. The evidence presented included body-worn camera footage from two officers who were present during the incident in question. The court also heard testimony from Memphis Police Officers Gene Bulak and Joshua Tremmel, as well as Investigator Eileen Knoblock, who is employed by the Federal Public Defender's Office.

On May 11, 2022, at approximately 7:56 p.m., officers of the Memphis Police Department ("MPD") were notified of the location of

a vehicle of interest via a Flock alert. (ECF No. 26.) Flock alerts are part of a law enforcement notification system designed to identify and locate stolen vehicles and individuals with outstanding warrants. (Tr. 12.) Throughout the city of Memphis, there are multiple cameras positioned such that they scan every license plate that passes by. (Id.) If a camera scans a license plate number that matches one in the MPD's database, it automatically issues a notification known as a Flock alert. (Id.) The Flock alert causes the laptops in nearby law enforcement vehicles to flash green and show the location of the vehicle, the reason it generated an alert, and a description of the vehicle that includes its color, make, and model. (Id.)

The May 11 Flock alert notified officers that a gray Nissan Maxima bearing Tennessee license plate number 29AR07 was traveling southbound through the intersection of Sycamore View and I-40. (ECF No. 26.) The car was observed driving in the rightmost lane on Sycamore View. (Tr. 25-26.) According to the alert, the individual associated with the car had several felony warrants. (Tr. 26.) The car was registered to an individual named Donald Moore, a Black male. (ECF No. 21.) Upon receipt of the Flock alert, officers were able to view Moore's driver's license photo. (Tr. 26.)

Shortly after the Flock alert was issued, Officer J. Thompson encountered what he believed to be the vehicle identified in the

Flock alert ("the Nissan"). (Tr. 15.) The Nissan was the same make, model, color, and body style as the wanted vehicle. (Tr. 33.) It was parked at the FairBridge Inn, which is located at 6015 Macon Cove, within the "immediate vicinity" of the camera that initiated the Flock alert. (Tr. 15, 48; ECF No. 26.) As Officer Bulak testified, Macon Cove is a street that intersects Sycamore View immediately south of the I-40 entrance, and a car driving in the rightmost lane of Sycamore View could turn right onto Macon Cove. (Tr. 25.) In an unmarked police vehicle, Officer Thompson "made a second pass to verify that it was the individual" that the officers were looking for. (Tr. 16.) However, because the Nissan was backed into its parking spot, Officer Thompson could not view the vehicle's license plate. (Tr. 16, 32-33.) He communicated to nearby officers via radio that he believed he had located Moore. (Id.) He told them that Moore was sitting in the driver's seat, while two men and a woman were standing in front of the Nissan. (Id.)

Officers Bulak, Tremmel, and L. Franklin responded to Officer Thompson's communication. (Tr. 16.) Officers Bulak and Tremmel were in the same marked police vehicle; Officer Franklin drove separately. (Tr. 14.) Officer Bulak navigated to the FairBridge Inn and parked perpendicular to the Nissan, such that the police vehicle blocked the Nissan from pulling directly forward. (Exhibit 2, video 2 at 1:08.) At that point, the Nissan was parked with both of its front doors open and hood up. (Id.) Standing around it

-3-

were four individuals: three men and one woman. (Id.) Among them was Marlon Donelson, a Black male. (ECF No. 21.) According to Officer Tremmel's testimony, Donelson resembled Moore in complexion, appearance, height, and weight.[1] (Tr. 42.)

Officers Bulak and Tremmel exited their vehicle. (Exhibit 2, video 1 at 1:08; video 2 at 1:08.) Officer Tremmel approached Donelson, who was standing next to the open hood of the Nissan. (Exhibit 2, video 2 at 1:08.) He then asked, "Are you Donald Moore?" (Id. at 1:10.) Donelson responded "Huh?" (Id. at 1:11.) Officer Tremmel repeated his question, and Donelson said that he was not Donald Moore. (Id. at 1:12.) Officer Tremmel then directed Donelson to close the hood of the car, and Donelson complied. (Id. at 1:17.) Donelson said, "Donald Moore? My name's Marlon Donelson." (Id. at 1:19.) Officer Tremmel informed Donelson that he was going to verify Donelson's identity. (Id. at 1:21.) He then told Donelson to stand beside the police vehicle and placed him in handcuffs. (Id. at 1:36.)

Thereafter, the officers attempted to ascertain Donelson's identity. (Tr. 41.) Officer Franklin took Donelson's wallet and removed his ID. (Exhibit 2, video 2 at 1:59.) Donelson repeated

---

[1] At the hearing, Donelson introduced booking photos of himself and Moore. (Exhibits 3, 4.) However, the officers at the scene viewed Moore's driver's license photo (not his booking photo) when they were assessing whether Donelson was the wanted individual. (Tr. 26.)

-4-

that his name was Marlon Donelson, not Donald Moore. (Id.) He provided his social security number to Officer Tremmel, who entered Donelson's information into the NCIC database. (Id. at 2:09; Tr. 47-48.) Officer Tremmel questioned Donelson about his date of birth and driver's license number. (Exhibit 2, video 2 at 2:32.) When Donelson provided correct answers, Officer Tremmel "apologized for the inconvenience" and immediately removed the handcuffs. (Id. at 2:36.)

After verifying Donelson's identity, Officer Tremmel turned his attention to the Nissan. (Id.) He asked where Donelson had gotten the car. (Id.) He also directed Officer Franklin to run the tag. (Id. at 2:41.) Officer Tremmel explained to Donelson that the officers were searching for the Nissan. (Id. at 2:50.) Donelson told the officers that the title to the Nissan was in his car and offered to show it to them. (Id. at 3:12.)

During Officer Tremmel's interaction with Donelson, Officer Bulak approached the back of the Nissan to verify that it was the vehicle from the Flock alert. (Tr. 17; exhibit 2, video 1 at 1:18.) He observed that the car bore a drive-out tag. (Tr. 18.) Based on the tag, Officer Bulak concluded that the Nissan was not the vehicle the officers were searching for. (Id.) He shouted to Officer Tremmel, "It's a drive-out." (Exhibit 2, video 1 at 2:40.) Officer Tremmel, apparently not hearing Officer Bulak, did not respond. (Id.) Officer Bulak then approached the driver's side of

the Nissan and looked through the window with his flashlight, where he observed a firearm. (Id. at 2:55.) He yelled, "Hey, there's a pistol on the seat." (Id. at 2:58.) At that point, Officer Bulak approached Donelson and asked if he had ever been convicted of a felony. (Id. at 3:05.) Donelson replied that he had. (Id. at 3:06.)

Officer Tremmel continued speaking with Donelson, as he remained unsure whether the Nissan was indeed the subject of the Flock alert. (Tr. 54, 58-59.) Officer Tremmel asked to see the title, and Donelson produced it from his wallet. (Exhibit 2, video 2 at 3:13.) Officer Tremmel also asked where Donelson had purchased the vehicle. (Id. at 3:32.) After Donelson provided an explanation, Officer Bulak asked Donelson to take a seat in the back of the squad car. (Id. at 3:50.) He was detained for being a suspected felon in possession of a firearm. (Tr. 46.)

The officers continued investigating both Donelson's possession of the firearm and the ownership of the Nissan. Officer Bulak searched the driver's seat of the car and retrieved the firearm. (Exhibit 2, video 1 at 4:09.) Meanwhile, Officer Tremmel examined the title that Donelson had provided. (Exhibit 2, video 2 at 4:08.) When the woman standing near the Nissan asked about the reason for the encounter, Officer Tremmel told her that somebody had been using the Nissan before Donelson purchased it, causing it to be associated with "some really bad stuff." (Id. at 4:23.) Officer Tremmel then walked to the back of the Nissan and

-6-

personally examined the license plate for the first time. (Id. at 4:50.)

About ten minutes after Donelson had been placed in the back of the police vehicle, he asked Officer Tremmel what was going on. (Exhibit 2, video 2 at 15:17.) Officer Tremmel explained that the officers had been incorrectly informed that Donelson's Nissan "matched somebody that had really bad warrants." (Id. at 15:21.) He went on to say that while they now understood that Donelson was unrelated to the subject of their investigation, "you are a convicted felon, and there was a pistol on the seat." (Id. at 15:43.) Donelson replied that the firearm did not belong to him, but rather to one of the other two men who had been fixing the Nissan. (Id. at 16:24.) Officer Tremmel asked why the man had not just given the gun to the other man. (Id. at 16:43.) Donelson said he did not know. (Id. at 16:46.) Officer Tremmel then asked him to exit the squad car. (Id. at 16:47.) He subsequently handcuffed Donelson, searched his pockets, patted him down, and returned him to the back of the squad car. (Id. at 16:52.)

For a period of about one hour and forty minutes, Donelson was detained in the backseat of the parked police vehicle. (Id. at 3:50-1:44:14.) The officers then drove him to the police station. (Id. at 1:44:14-2:04:08.) At no point did the officers administer Miranda warnings to Donelson. (Exhibit 2, video 1, video 2.)

Donelson was later indicted for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (ECF No. 1.) Donelson subsequently filed a Motion to Suppress. (ECF No. 21.) He alleges that MPD officers lacked reasonable suspicion to seize him and failed to provide Miranda warnings as required. (Id.) For those reasons, he asks the court to suppress "all evidence found as a result of the unlawful seizure and all statements made thereafter." (Id.) The United States opposes the Motion to Suppress, arguing that officers had reasonable suspicion to seize Donelson and that no Miranda warnings were required. (ECF No. 26.) The court held a suppression hearing on November 3, 2022. (ECF No. 27.)

## II. PROPOSED CONCLUSIONS OF LAW

### A. Lawfulness of Terry Stop

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause[.]" U.S. Const. Amend. IV. To protect this right, courts have delineated three categories of permissible encounters between police and citizens: "(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if non-consensual, must be supported by a reasonable articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause." United States v.

Waldon, 206 F.3d 597, 602 (6th Cir. 2000) (citing United States v. Avery, 137 F.3d 343, 352 (6th Cir. 1997)) (citations omitted). An investigative detention, also known as a Terry stop, permits officers to approach a citizen and investigate possible criminal behavior despite lacking probable cause to initiate an arrest. Adams v. Williams, 407 U.S. 143, 145 (1972).

The United States does not claim that the encounter was consensual. (ECF No. 26.) As such, the court will consider whether the MPD conducted a permissible investigative detention of Donelson. When determining whether a Terry stop was constitutional, courts undertake a two-part analysis: first, they must ask whether there was a proper basis for the stop. United States v. Mays, 643 F.3d 537, 541 (6th Cir. 2011). Second, they must determine whether the degree of intrusion "was reasonably related in scope to the situation at hand." Id.

1. Basis for Stop

A Terry stop is proper if it is supported by reasonable suspicion. Terry v. Ohio, 392 U.S. 1, 3 (1968); United States v. Heath, 259 F.3d 522, 528 (6th Cir. 2001). This standard requires officers to justify their stop with "a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417–18 (1981). Reasonable suspicion may be formed based on an officer's direct observations as well as other sources, including "informant tips,

-9-

dispatch information, and directions from other officers." United States v. Phillips, 553 F. App'x 533, 534-35 (6th Cir. 2014) (quoting Dorsey v. Barber, 517 F.3d 389, 395 (6th Cir. 2008)). To determine whether reasonable suspicion existed, courts are directed to consider the totality of the circumstances surrounding a stop. United States v. Perez, 440 F.3d 363, 371 (6th Cir. 2004) (citing United States v. Arvizu, 534 U.S. 266, 273–77 (2002) and United States v. Orsolini, 300 F.3d 724, 728-29 (6th Cir. 2002)).

Preliminarily, the undersigned notes that although the officers were incorrect in their suspicion that Donelson was the wanted suspect, "[t]hat their suspicion was wrong does not affect our evaluation of whether it was reasonable." United States v. Davis, 341 F. App'x 139, 140 (6th Cir. 2009) (citing Houston v. Clark County Sheriff Deputy John Does 1-5, 174 F.3d 809, 813 (6th Cir. 1999)); see, e.g., United States v. Goyer, 567 F. App'x 414, 419 (6th Cir. 2014) (finding that reasonable suspicion existed where the defendant was mistaken for a suspect who matched his physical description, wore the same earring, and resided in the apartment where he was found).

Additionally, the criminal activity of which officers must have suspicion may be a past crime. See United States v. Sheckles, 996 F.3d 330, 343 (6th Cir. 2021); United States v. Dickens, 748 F. App'x 31, 39 (6th Cir. 2018). If police have reasonable suspicion that a person is wanted in connection with a completed

felony, then a Terry stop is permissible. Sheckles, 996 F.3d at 343 (citing United States v. Hensley, 469 U.S. 221, 229 (1985)). In the instant case, officers were attempting to seize an individual who was wanted on felony warrants. (Tr. 26.) Terry's requirement that officers have suspicion of criminal activity is thus satisfied. The question before the court is therefore whether the officers had reasonable suspicion that Donelson was the wanted individual they were seeking.

The undersigned finds that they did. First, Donelson's Nissan was the same make, model, color, and body style as the Nissan reported by the Flock alert. (Tr. 33.) Second, Donelson resembled the wanted individual's description in facial hair, haircut, height, and complexion. (Tr. 32-33.) Finally, his Nissan was found within the immediate vicinity of the camera that had issued the Flock alert. (Tr. 48.) These facts, taken together, provided a "particularized and objective basis for suspecting" that Donelson was the wanted individual who officers were seeking. Cortez, 449 U.S. at 417–18.

At the hearing, Donelson contended that these descriptors were too general to support a finding of reasonable suspicion. (Tr. 5.) It is true that "conduct or circumstances that describe a very large category of presumably innocent [persons] is not sufficient to constitute reasonable suspicion." United States v. Craig, 306 F. App'x 256, 260 (6th Cir. 2009) (quoting United States

-11-

v. Jennings, 985 F.2d 562, 1993 WL 5927, at *5 (6th Cir. Jan. 13, 1993) and Reid v. Georgia, 448 U.S. 438, 441 (1980)) (alteration in original). The court must determine whether the description as a whole described a "sufficiently narrow class" of suspects. United States v. Babb, 77 F. App'x 761, 767 (6th Cir. 2003). In this case, the undersigned finds that it did. The officers were seeking a gray Nissan Maxima driven by a Black male with specific physical features. Although it was later determined that the license plate did not match the Flock alert information, the officers could not make that determination because the Nissan's license plate was not immediately visible due to how it was parked. Importantly, the officers were searching for a vehicle fitting this description within the vicinity of a camera located at one specific intersection, I-40 and Sycamore View. The Sixth Circuit has found that this degree of specificity is sufficient to support a finding of reasonable suspicion. See United States v. Long, 464 F.3d 569, 571, 575 (6th Cir. 2006) (finding reasonable suspicion where officers were searching for a black and gray Ford Ranger with extended cab driving toward a particular street); Babb, 77 F. App'x at 767 (stating that a description of a Black male "of a certain age and size" in a silver or gray Oldsmobile Alero with Michigan plates created a sufficiently narrow class of suspects to support a finding of reasonable suspicion); United States v. Hurst, 228 F.3d 751, 757 (6th Cir. 2000) (holding that officers had reasonable

suspicion to seize a car "roughly matching the appearance" of the suspect's car in color and style that was traveling away from the scene of a burglary). Based on the descriptions provided by the Flock alert and by Officer Thompson, the officers had reasonable suspicion that Donelson was the individual wanted on felony warrants. The undersigned therefore finds that there was a proper basis for the Terry stop.

2.   Degree of Intrusion

After finding that there was a proper basis for stopping Donelson, the court must determine whether the subsequent intrusion was reasonably related in scope to the situation at hand. Mays, 643 F.3d at 541. The undersigned finds that it was. When the officers initially arrived at the FairBridge Inn, they were searching for a vehicle associated with Donald Moore, a wanted individual. Believing they had found that person, they placed Donelson in handcuffs and asked if he was Donald Moore. When Donelson denied that he was, the officers checked Donelson's driver's license and searched his name in the NCIC database. This confirmed that Donelson was not the individual with felony warrants. Less than one minute after being handcuffed, Donelson's handcuffs were removed. (Exhibit 2, video 2 at 1:45-2:44.)

The use of handcuffs does not necessarily render a Terry stop unreasonably intrusive, "so long as the circumstances warrant that precaution." Houston, 174 F.3d at 815 (citing United States v.

-13-

Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993) (collecting cases)); see also United States v. Monhollen, 145 F.3d 1334, 1998 WL 152934, at *2 (6th Cir. Mar. 24, 1998) ("The officers' action in placing [the defendant] in handcuffs while they secured the area is precisely the conduct permitted by Terry."). "Intrusive measures are warranted to secure a detainee only where specific facts lead to an inference that the detainee poses a risk of flight or of violence to the officers." Brown v. Lewis, 779 F.3d 401, 415 (6th Cir. 2015). In this case, the officers believed that they were apprehending an individual with multiple felony warrants. Additionally, the officers encountered two other men and a woman at the scene. For these reasons, they were justified in placing Donelson in handcuffs.

At the hearing, Donelson argued that the officers unnecessarily prolonged the stop by continuing to ask Donelson questions after verifying his identity. (Tr. 72.) However, the fact that Donelson was not Moore did not end the officers' inquiry: they were still determining whether Donelson's Nissan was the vehicle associated with Moore. They therefore continued to question Donelson about the purchase and title of his car until they concluded that the car itself was not the subject of the Flock alert. Both lines of inquiry were reasonably related to determining the whereabouts of an individual with felony warrants. The conversation lasted just over two minutes, after which officers

-14-

learned that Donelson was a felon. (Exhibit 2, video 2 at 1:07-3:09.) This was a minimally intrusive encounter that did not exceed the scope of the justification for the Terry stop.

It was during this permissible intrusion that Officer Bulak observed a firearm in the front seat of Donelson's Nissan using a flashlight. The United States argues that the firearm was in Officer Bulak's plain view, and the undersigned agrees. "Under the plain-view doctrine, if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." United States v. Galaviz, 645 F.3d 347, 355 (6th Cir. 2011) (quoting United States v. Herndon, 501 F.3d 683, 692 (6th Cir. 2007)) (internal quotations omitted). The United States has demonstrated that these requirements were met. First, as previously explained, Officer Bulak was lawfully present to investigate whether the Nissan was involved in criminal activity. His use of a flashlight did not change the lawfulness of his intrusion. See United States v. Harper, 488 F. App'x 63, 67 (6th Cir. 2012) (citing Texas v. Brown, 460 U.S. 730, 739-40 (1983) and noting that the use of a flashlight to look into the interior of a vehicle "does not implicate the Fourth Amendment."). Second, the incriminating character of the firearm became apparent when Officer Bulak asked whether Donelson was a felon and Donelson replied that he was.

-15-

Third, Officer Bulak had a lawful right of access to the firearm. The presence of the firearm, combined with Donelson's felony status, created probable cause that Donelson had violated 18 U.S.C. § 922(g)(1) by possessing a firearm after being convicted of a felony. This authorized Officer Bulak to search the Nissan, giving him a lawful right of access to the firearm on the front seat. See United States v. Avant, 650 F. App'x 890, 893 (6th Cir. 2016) (citing Galaviz, 645 F.3d at 357). Because these elements are satisfied, the officers' seizure of the firearm did not violate the Fourth Amendment.

The officers in this case had reasonable suspicion that Donelson was involved in criminal activity, and they acted on that suspicion in a manner that was reasonably related to the scope of their investigation. That suspicion remained reasonable while, simultaneously, officers discovered evidence that Donelson was a felon in possession of a firearm. The undersigned therefore finds that Donelson was subject to a lawful Terry stop.

**B.  Necessity of Miranda Warnings**

Donelson also argues that his statements to law enforcement should be suppressed because the officers failed to provide Miranda warnings prior to questioning him. (ECF No. 21.) "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure

the privilege against self-incrimination." Tolliver v. Sheets, 594 F.3d 900, 916 (6th Cir. 2010) (quoting Miranda v. Arizona, 384 U.S. 436, 444 (1966)). The necessity of Miranda warnings therefore turns on whether Donelson was subject custodial interrogation when he was being questioned.

To determine whether a defendant was subject to custodial interrogation, courts are directed to look to the "totality of the circumstances" to "determine how a reasonable man in the suspect's position would have understood the situation." United States v. Swanson, 341 F.3d 524, 528 (6th Cir. 2003) (quoting United States v. Salvo, 133 F.3d 943, 948 (6th Cir. 1998)) (internal quotations omitted). Custodial interrogation entails "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." United States v. Knox, 839 F.2d 285, 291 (6th Cir. 1988) (internal citation and quotation omitted). However, "[n]ot all restraints on freedom of movement amount to custody for purposes of Miranda." Howes v. Fields, 565 U.S. 499, 509 (2012). A suspect who does not feel free to terminate an encounter is only in custody for purposes of Miranda if "the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda." United States v. Howard, 815 F. App'x 69, 78-79 (6th Cir. 2020) (quoting Fields, 565 U.S. at 509). The Sixth Circuit has set out four factors to consider when determining if a suspect is in custody: "(1) the

-17-

location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions." United States v. Luck, 852 F.3d 615, 621 (6th Cir. 2017) (quoting United States v. Hinojosa, 606 F.3d 875, 883 (6th Cir. 2010)).

Upon weighing these factors, the undersigned finds that Donelson was not subject to custodial interrogation when he told officers that he was a convicted felon. First, the questioning occurred beside the police vehicle at the FairBridge Inn, not inside the police vehicle or at the police station. Second, Donelson had only been questioned for about two minutes when he made the statement. Third, there was little restraint on his freedom of movement. While Donelson's Nissan was blocked in by the police car, he was no longer handcuffed, nor was his body physically restrained in any way. Fourth, the officers did not comment either way on whether Donelson needed to answer their questions. Together, these factors weigh against a finding of custodial interrogation.

It is unclear from Donelson's motion whether he is also moving to suppress the statements he later made to officers about the ownership of the seized firearm. To the extent that these statements are the subject of Donelson's Motion to Suppress, the undersigned finds that no Miranda warnings were warranted.

-18-

"Statements given freely and voluntarily are admissible whether or not a defendant has been informed of his rights." United States v. Jones, 128 F. App'x 490, 494 (6th Cir. 2005) (citing Miranda, 384 U.S. at 478); see also United States v. Thomas, 381 F. App'x 495, 502 (6th Cir. 2010) ("[A]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence.") (quoting Rhode Island v. Innis, 446 U.S. 291, 299-300 (1980)). Donelson's statement regarding the ownership of the firearm was made voluntarily. He initiated the conversation with Officer Tremmel by asking what was going on. Officer Tremmel explained that while Donelson was not the individual the officers were looking for, they had located a firearm in his vehicle during the encounter. Donelson responded by telling Officer Tremmel that the firearm belonged to one of the other individuals who had initially been standing around the Nissan. This statement was not made in response to police interrogation; rather, it was made freely and voluntarily by Donelson. As such, no Miranda warnings were required.

### III. RECOMMENDATION

For the reasons above, it is recommended that Donelson's Motion to Suppress be denied.

Respectfully submitted,

s/ Tu M. Pham
TU M. PHAM
Chief United States Magistrate Judge

<pre>
December 16, 2022
Date
</pre>

**NOTICE**

**NOTICE WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THIS REPORT AND RECOMMENDED DISPOSITION, ANY PARTY MAY SERVE AND FILE SPECIFIC WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS AND RECOMMENDATIONS. ANY PARTY MAY RESPOND TO ANOTHER PARTY'S OBJECTIONS WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND FURTHER APPEAL.**